UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

DAVID E. POREMBA,                    )
                                     )
         Plaintiff,                  )
                                     )
v.                                   ) No. 11 CV 50091
                                     ) Honorable Iain D. Johnston
CAROLYN W. COLVIN,                   ) Magistrate Judge
Secretary of Social Security,        )
                                     )
         Defendant.                  )

## MEMORANDUM OPINION AND ORDER

David E. Poremba ("the Claimant") brings this action under 42 U.S.C. §405(g), seeking reversal or remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying the Claimant's application for disability insurance benefits under Title II of the Social Security Act ("SSA"). This matter is before the Court on cross-motions for summary judgment. (Dkt. ##22, 30).

The Claimant argues that the Commissioner's decision denying his application for benefits should be reversed or remanded for further proceedings because the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence and is contrary to law. The Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence. For the reasons set forth more fully below, the Claimant's motion for summary judgment is denied, and the Commissioner's motion is granted.

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

1

# I. BACKGROUND

A. Procedural History

The Claimant filed an application for disability on October 20, 2006, alleging a disability onset date of February 12, 2005. R. 261-66.  On February 7, 2007, this application was initially denied, and was denied upon reconsideration on March 30, 2007.  Dkt. #10, p. 2.  On April 5, 2007, the Claimant filed a request for a hearing. Dkt. #10, p. 2.  On April 1, 2008, the ALJ conducted a hearing in Evanston, Illinois. Dkt. #10, p. 2.  The Claimant and Medical Expert ("ME") Daniel Schiff, M.D. testified at the hearing. R. 79.  Vocational Expert ("VE") James Radke was present during the hearing but did not testify. R. 78 – 79.

On April 16, 2008, the ALJ issued a decision denying the claim for benefits. R. 132 – 140.  The Claimant requested the Appeals Council review the ALJ's decision. On December 18, 2008, the Appeals Council remanded the matter to the ALJ to consider and address several issues. R. 141 – 43.

On August 6, 2009, the ALJ held another hearing. R. 13.  Before this hearing, the Claimant amended his application to limit the claim to a closed period. Specifically, the Claimant sought benefits for the closed period beginning on February 12, 2005 and ending on January 27, 2009, which was the day before he began full-time employment with Walmart. R. 17, 261, 344.  Again, the Claimant and Dr. Shift testified.  R. 13 – 14.  And again, although present, VE Radke did not testify. R. 13 – 14.  On November 4, 2009, the ALJ issued another decision, again denying the claim for benefits. R. 144 – 64.  The Claimant filed another request for

2

review with the Appeals Council. But, on February 8, 2011, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner. Dkt. #10, p. 2 – 3. Thereafter, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

B. Hearing Testimony

    1. April 1, 2008 Hearing ("First Hearing")

        a. Claimant

At the first hearing, the Claimant testified that he lived with his wife in the Woodstock, Illinois area, and that his children lived nearby with his grandchild. R. 100. He would babysit his grandchild with his wife. R. 101.

The Claimant testified that he had last worked at a pet rescue facility in February of 2005. R. 84. He worked full time there from October 2004 to February 2005, but left because of "extreme difficulties with . . . the way the operations were being run and handled." R. 85. The Claimant testified that he sought treatment due to gambling and drinking problems. R. 86. The Claimant testified that although he had been diagnosed with hypertension and diabetes, those conditions were "under fairly good control." R. 86. According to the Claimant, his hypertension and diabetes were not the reason why he could not work. R. 87. But, according to the Claimant, he was still suffering from symptoms from the diabetes, including tingling in his feet and hands. R. 87, 91 - 92. The Claimant assumed the tingling was caused by the diabetes. R. 93. At the time of the first hearing, the tingling did not impede or hinder the Claimant's ability to engage in activities. R. 93. According

to the Claimant, he was "able to do what [he] needed to do." R. 94. The Claimant thought that his hypertension made him nervous, but he had no diagnosis that his hypertension and nervousness were correlated. R. 87 – 88.

The Claimant testified that he would fixate on issues and "would think about it over and over and over again." R. 89.

With regard to alcohol use, the Claimant testified that he last drank alcohol in May of 2007, which would have been about one year before the first hearing. R. 90.

The Claimant testified that he saw therapists because of his anger management issues, and he was prescribed medication that "helped [him] better cope with the anxieties." R. 94 – 95. The Claimant testified that he needed lithium to control his extreme emotions. R. 101. According to the Claimant, he has mood swings. During the low times he felt like his stomach was churning; he would feel depressed, unhappy and sad. R. 102. During the high times, the Claimant testified that it felt like he "was right on target" and "meeting objectives." R. 103.

The Claimant discussed the verbal altercations he had with others, but that sometimes, such as an incident with a librarian, he was able to avoid the altercation. R. 97 – 98. According to the Claimant, he would yell at his windshield while driving when people did "something stupid in front of [him]." R. 99. But he never exited the vehicle to engage in a confrontation. R. 99. One time, the Claimant did yell at a friend who startled him when he was cutting grass. R. 100.

The Claimant testified about his renovations to his house, which is a 1904 farmhouse. R. 105. He also testified that he gardened a three by eight foot plot. R. 105 – 06. According to the Claimant, he would "play around with the house and garden." R. 106. He also tinkered with cars with a group of friends two to three times a week. R. 107. Additionally, he transported his father and babysat. R. 107.

When specifically asked why he could not work, the Claimant said that he had high emotions, anxieties and sleep problems. R. 108. He described his sleep problems as waking up for about an hour at night, which would then cause him to take about an hour nap during the day. R. 108. But he did not nap every day. R. 109. The Claimant also testified that he left jobs because he would become involved in disagreements at work. R. 109 – 17.

### b. Medical Expert

At the first hearing, Dr. Schiff – a board certified psychiatrist – testified that he reviewed the exhibits and heard the Claimant's testimony. R. 117. According to Dr. Schiff, the Claimant was not suffering from a "medically determinable mental impairment." R. 119. But Dr. Schiff noted that the Claimant had "a drinking problem". R. 119. Dr. Schiff opined that the Claimant's use of alcohol was a significant issue that contributed the Claimant's other conditions. R. 120. Dr. Schiff also opined that the Claimant's behavior did not "fit a bipolar" condition and that the "anxiety" the Claimant described "sound[ed] more like worry." R. 120. When the ALJ pushed Dr. Schiff on the issue of whether the Claimant was bipolar, Dr. Schiff said he did not see the manifestations of that disorder. R. 120. Dr. Schiff

5

believed that the Claimant was "relatively functional" and found nothing marked about the Claimant's behavior. R. 121. The ALJ specifically asked Dr. Schiff if there were any impediments to the Claimant working. R. 122. Dr. Schiff stated, "No. It might be that if he is in a supervisory capacity and is not respected, he'll lose his temper. It might be better not to be in a supervisory capacity." R. 122. Dr. Schiff again opined that the Claimant's alcohol abuse was a "significant contribution". R. 124. Dr. Schiff disagreed with the Claimant's treater regarding whether the Claimant's alcohol consumption contributed to the Claimant's limitations. R. 126 – 27.

2. August 6, 2009 Hearing ("Second Hearing")

At the August 6, 2009, hearing, the Claimant's attorney reiterated that the application was being amended to a closed period (from February 12, 2005 to January 27, 2009). R. 17.

a. Claimant

At the second hearing, the Claimant testified that he was currently taking Lotrel and Glyburide, which was prescribed by Dr. Salzman. R. 28. He was also taking Janumet, but his physician was changing the prescription to Metformin and Trilipix. R. 29.

At the time of the second hearing, the Claimant was living with his wife and working on his two-story home. R. 35 – 37. His house projects included painting the whole house over the course of a couple of months. R. 36, 38. He would spend anywhere between two and four hours each day painting the house. R. 37. Initially,

the Claimant needed to prepare the house to be painted, including scraping and trim work. R. 37.  Painting the house required the Claimant to work on a ladder. R. 37.  The Claimant would lift "whatever [he] had to do." R. 51.  He would also carry the ladder around and lift cans of paint. R. 52.   In addition to painting his house, the Claimant also re-sealed his driveway, which took a total of five (5) hours. R. 38. When he re-sealed the driveway, he carried 4.75 gallon containers. R. 52.

The Claimant explained that he had started working at Walmart in January of 2009.  He initially helped convert the store into a super center, after which time he was moved to the deli area. R. 29 – 30.  During the conversion, the Claimant worked on his feet, reconfiguring shelving. R. 30 – 31.  In the deli department, the Claimant cooks, slices meat, cleans and stocks the shelves. R. 31.  While working in the deli department, the Claimant is on his feet. R. 32.  On occasion, he is required to lift a box of chickens which weighs about 30 pounds. R. 32.  Typically, he only lifts a pound of ham or a side of ham. R. 32.  During the opening of the store, there was a lot of stress, some of which was caused by his supervisors who were also stressed. R. 32.  According to the Claimant, his supervisors were rough and rude to the employees, including him. R. 33.  The Claimant felt that he got along well with his co-workers and customers. R. 34.  The Claimant said he had no problems "exploding" with customers. R. 35.

The Claimant testified that about one month before the second hearing, he drank alcohol, which was a watered down version of a vodka and tonic. R. 35. According to the Claimant, he would have one drink once a month. R. 35.

The Claimant also testified that he cared for his elderly father. R. 36. The Claimant also still tinkered with cars. R. 43.

The Claimant testified that he monitored his blood sugar and took readings four (4) times a week at different times of the day. R. 39. According to the Claimant, his hemoglobin level was also doing really well." R. 40. Additionally, his diabetes was improving, which increased his energy level and lowered his explosiveness. R. 40. The Claimant's blood pressure was under better control. R. 48.

Although he was still anxious, the Claimant testified that he could "work through" those difficulties. R. 41. The Claimant testified that he still fixated on issues. R. 43. According to the Claimant, he still took issues "home mentally." R. 46.

Upon examination by his own counsel, the Claimant testified that he would take a nap of up to an hour during the day because he could not sleep at night. R. 48. He also testified that he could not have worked during the closed period because of the mental stress. R. 49.

The Claimant testified that he had *not* been told by any doctor not to lift or do physical exercise. R. 52.

### b. Medical Expert

At the second hearing, Dr. Schiff, a board certified psychiatrist, again testified that he reviewed all the exhibits. R. 55. According to Dr. Schiff, there was "insufficient, consistent, persistent evidence to be sure of any enduring severe

8

psychiatric condition." R. 57. Dr. Schiff noted the multiple labels given to the Claimant's mental afflictions so that Dr. Schiff was uncomfortable with the accuracy of the labels. R. 57. Dr. Schiff found that the Claimant was "relatively functional, period." R. 58. Dr. Schiff testified that considering all of the Claimant's issues, he still did not meet or equal a listing. R. 58. Dr. Schiff found no evidence of decompensation of an expanded duration. R. 59. Dr. Schiff found that the Claimant used excellent judgment in dealing with his work situations. R. 61. According to Dr. Schiff, to the extent the Claimant would have difficulty at work, it would have been related to how much alcohol was consumed on a particular day, but the record was lacking in showing a correlation between behaviors and drinking alcohol. R. 63. In other words, according to Dr. Schiff, nothing other than alcohol contributed to the Claimant's difficulties. R. 64. Dr. Schiff testified that he disagreed with the diagnosis of bipolar disorder because he did not believe there was enough evidence in the record. R. 65. Additionally, due to the number of other diagnoses, Dr. Schiff was uncomfortable with a diagnosis of bipolar disorder. R. 66.

Throughout Dr. Schiff's testimony, he repeatedly referenced and relied upon Dr. Sherman's report. R. 57, 59, 61, 62. Dr. Sherman's report is contained in the file as Exhibit 4F. R. 385-89. According to Dr. Schiff, Dr. Sherman's report was "the most detailed report". R. 57. According to Dr. Schiff, Dr. Sherman's report found that the Claimant did not show base signs of mania or depression. R. 57. As noted previously, Dr. Sherman's report also stated that the Claimant's mood disorder was caused by alcohol abuse. R. 388. Dr. Schiff also relied upon the progress notes

indicating that the Claimant was feeling better during the time the Claimant was abstaining from alcohol. R. 65 – 67, 484-86.

The ALJ then left open the record to allow the Claimant's attorney to supplement the record with treatment notes as well as commentary for the relevant time period. R. 69 – 70. The Claimant's counsel represented that she was going to ask Dr. Slazman "a couple of questions" and "have him supply his treatment notes and explanation for why he says what he does or doesn't say." R. 70. Although the record contains the question posed by the Claimant's counsel, the record does *not* indicate additional treatment notes were provided.

C. Medical Record Evidence

Because the issues raised in the Claimant's appeal relate to (1) whether his hypertension and diabetes were severe impairments and (2) whether the Claimant's alcohol abuse was a contributing factor material to his affective disorder, only those medical records relating to these issues will be addressed.

1. Medical Record Evidence Relating to 2005 - 2006

A March 31, 2005 medical record by Dr. Vamsi Garlapati of Horizons Behavioral Health indicates that the Claimant had hypertension and was taking Fluoxetine as well as Lotrel. R. 382. This document also states "At this point, there is no evidence of primary mood disorder or anxiety disorder." R. 382. The document also indicates that the Claimant drank significantly in the past and that at that time he was currently drinking. R. 382. A July 12, 2005 physician progress note indicated that the Claimant was abusing alcohol and was taking Prozac. R.

10

384. A psychiatric diagnostic interview examination of October 28, 2006 references the Claimant being bipolar. R. 378, 380.[2]

A November 14,2006 progress note indicates that the Claimant recognizes that he should not be drinking alcohol to excess but that he does. R. 446.

According to a medical record created by Dr. Marvin Salzmann on November 30, 2006, the Claimant was diagnosed with hypertension that resulted in damage to his left ventricle; he was taking Lotrel, Lithium and Fluoxtine; the Lithium resulted in hypothyroidism; and the Claimant was bipolar. R. 358 – 62. Dr. Salzmann also indicated that he had not placed any restrictions on the Claimant's ability to engage in physical activity. R. 360. A record from Simon Cardiac Center indicated that the left ventricle was not dilated and contracted normally and symmetrically with no wall motion abnormalities. R. 363. This record stated that the impression was that the Claimant had "borderline concentric left ventricular hypertrophy with a slightly dilated ascending aortic root." R. 364.

A December 12, 2006, physician progress note from Dr. Garlapati indicated that the Claimant had anxiety disorder not otherwise specified, pathological gambling, alcohol abuse and features of a narcissistic personality. R. 365. That note contained rule out diagnoses of generalized anxiety disorder and cyclothymia. R. 365. According to the Claimant's brief, cyclothymia "is a mood disorder, defined as a mild form of bipolar disorder." Dkt. #23, p. 11.

2. Medical Record Evidence Relating to 2007 – 2008

---

[2] Between August 9, 2005 and May 16, 2006, Dr. Garlapati created previous progress notes with the same diagnoses. R. 367, 368, 369, 370, 371, 372, 373, 374.

A January 4, 2007 progress note indicates that the Claimant was still drinking alcohol. R. 444.

On January 18, 2007, Barbara Sherman, Psy.D., a licensed clinical psychologist, examined the Claimant. R. 385 – 89.  During Dr. Schiff's testimony, he repeatedly relied upon this examination to support his opinions. R. 59, 61.  Dr. Sherman's report states the following: the Claimant's sleep was unproblematic, although he has "a history of occasionally becoming so energetic that he [is] not able to sleep;" the Claimant was taking lithium, Prozac and medication for hypertension; the Claimant acknowledged alcohol use, and documents indicated that he had difficulties with alcohol abuse; the Claimant said he had an old farmhouse and he spends time doing home improvements, shopping for antiques, and "engages in sports activities whenever he has the opportunity;" the Claimant also reads, watches television, cooks and cleans; and the Claimant drives and grocery shops. R. 386.  With respect to the Claimant's mental status, Dr. Sherman's report states that the Claimant described himself as feeling in a "depressed mode," sad and irritable; he also had episodes of feeling excessively energetic and having difficulty sleeping. R. 387.  According to Dr. Sherman, the results of the examination were an adequate representation of his level of emotional functioning, although there was "some minimizing of past addiction difficulties in comparison with the reports reviewed." R. 388.  The reference to "addiction" did not indicate whether Dr. Sherman meant the Claimant's alcohol abuse or gambling problems.  For a diagnosis, Dr. Sherman indicated the following: pathological gambling, alcohol abuse disorder, *mood*

12

*disorder due to alcohol abuse* with mixed anxiety and depression, and narcissistic personality traits (per past reports). R. 388 (emphasis added). The report also stated that the Claimant alleged "being disabled by bipolar disorder," but during the interview, Dr. Sherman found that "he did not acknowledge pervasive symptoms of either mania or depression." R. 388. Dr. Sherman also found that although the Claimant acknowledged a history of alcohol abuse, compared with past reports, he was minimizing the extent of the abuse. R. 389. Dr. Sherman also noted that the Claimant "did not acknowledge significant limitations in his daily functioning." R. 389. Dr. Sherman then noted that the Claimant was "able to spend his time doing home repair and shopping as well as other projects including sports involvement." R. 389. With respect to the Claimant's mental health, Dr. Sherman noted that "there were no pervasive signs of affective disorder." R. 389.

A January 31, 2007 psychiatric review document checked the following boxes under the heading "Category(ies) Upon Which the Medical Disposition is Based": Affective Disorders, Personality Disorders, and Substance Addition Disorders. R. 390. The same document indicated the following affective disorder: "Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: . . . mood disorder." R. 393. And under "Personality Disorders," the document lists narcissistic personality traits. R. 397. Additionally, under Substance Addiction Disorders, checked in the document are the following: "Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system;" "Affective disorders" and

"Personality disorders." R. 398. Under the rating of functional limitations, no functional limitations were noted for "C" criteria, but the following were noted for "B" criteria: "mild" for "restriction of activities of daily living," "moderate" for "difficulties in maintaining social functioning," "moderate" for "difficulties in maintaining concentration, persistence, or pace," and "none" for "episodes of decompensation". R. 400 – 01. The consultant's notes contain a summary of the Claimant's records, including Dr. Garlapati's notes dated December 12, 2006, and Dr. Sherman's report dated January 18, 2007, and state the following: "The claimant has a history of substance abuse with a diagnosis of pathological gambling, mood disorder due to alcohol abuse with mixed anxiety and depression, and narcissistic personality traits. The mental status exam and daily activities indicate the severity does not meet or equal any mental listing, but is more than non-severe. Although the claimant may have problems understanding, remembering, and the ability to carry out detailed instructions, the claimant retains the mental capacity to perform simple one and two-step task at a consistent pace." R. 402, 406.

A February 27, 2007 progress note indicates that the Claimant was drinking two alcoholic drinks each day. R. 441.

Physician progress notes from February through April of 2007 authored by Dr. Garlapati show that the Claimant was drinking alcohol up to two to three times per day, and stated that the Claimant had mood disorder not otherwise specified with features of bipolar, hypomanic and mildly ill. Dr. Garlapati also indicated that

14

the Claimant suffered from continuous pathological gambling, continuous alcohol abuse and features of narcissistic personality. R. 416, 417, 428.

The Claimant claims to have stopped drinking alcohol in about May of 2007. R. 90; R. 455. At that time, the progress notes begin to indicate that the Claimant was feeling better. R. 455.

A June 18, 2007 progress note indicates that the Claimant was feeling better. R. 453.

A July 10, 2007 progress note states that the Claimant's wife said that there was increased communications between her and the Claimant and that she attributed the increased communication to the Claimant's decreased alcohol consumption. R. 452.

An August 14, 2007 progress note indicates that the Claimant had abstained from alcohol for a few months and that he was "feeling significantly better." R. 448, 473.

Dr. Martin Salzmann's August 21, 2007, physical examination of the Claimant indicated that the Claimant was bipolar and suffering from hypertension. R. 429, 432.

A September 11, 2007 progress note indicates that the Claimant was still abstaining from alcohol and was feeling better. R. 447. The note also stated that the Claimant had reported no behavioral problems. R. 472.

Progress notes dated November 6, 2007, January 8, 2008 and January 24, 2008, March 4, 2008, and April 2, 2008 all indicate that the Claimant was feeling better. R. 469 – 71. During this time, the Claimant was abstaining from alcohol.

The Claimant's second unfavorable ruling occurred on April 16, 2008. R. 132. On April 22, 2008, although the Claimant continued to abstain from alcohol, he was feeling anxious, sad and frustrated with his social security appeal. R. 484.

Except for the document created by the Claimant's counsel following the second hearing, no medical records exist indicating that any treating physician placed any limitations on the Claimant engaging in physical activity. R. 415. Indeed, even after the Claimant's echocardiogram, Dr. Salzmann did not place limitations on the Claimant's physical activity any time before the second hearing. R. 363 – 64; Dkt. #23, p. 3.

D. ALJ's Decisions and Appeals Council Review

In the ALJ's first decision, issued on April 16, 2008, the ALJ found that the Claimant met the insured status requirements of the SSA through September 30, 2009. Second, the ALJ found that the Claimant had not engaged in substantial gainful activity since February 12, 2005. R. 136. Third, the ALJ found that the Claimant had the following severe impairment: substance abuse disorder. R.136. Fourth, the ALJ found that this impairment did not meet or equal one of the listed impairments. R. 136. Fifth, the ALJ found that the Claimant had a residual functional capacity as follows: The Claimant could perform a full range of work at all exertional levels but was limited to unskilled work tasks. R. 137. In making her

residual functional capacity determination, the ALJ relied upon the opinion of Dr.
Daniel Schiff, the medical expert, and rejected the Claimant's former psychiatrist,
finding that the psychiatrist's opinion was "absurd on its face." R. 139.

On December 19, 2008, the Appeals Council issued its review of the April 16,
2008 decision. R. 141 – 43. The Appeals Council remanded the matter to the ALJ to
evaluate the Claimant's obesity; further consider the Claimant's maximum residual
function capacity ("RFC"); determine whether the Claimant was disabled, taking
into consideration all the impairments including alcohol abuse; and if the Claimant
were disabled, then determine whether the Claimant's alcohol abuse was material.
R. 143.

In the ALJ's second decision, issued on November 4, 2009, the ALJ first found
that the Claimant met the insured status requirements through September 30,
2009. R. 150. Second, the ALJ also found that the Claimant had not engaged in
substantial gainful employment during the closed period of disability: February 12,
2005 through January 27, 2009. Third, the ALJ found that the Claimant had the
following severe impairments: affective disorder, and a history of drug addiction
and/or alcoholism that was currently in remission. R. 150. Notably, the ALJ did not
find either the Claimant's hypertension or diabetes was a severe impairment.
Third, the ALJ found that the Claimant did not have an impairment or combination
of impairments that met or medically equaled a listing during the closed period. R.
151. Fourth, the ALJ found that, during the closed period, the Claimant had a
residual functional capacity as follows: the Claimant could perform a full range of

17

work at all exertional levels but that he could understand, remember and carry out no more than simple instructions, could make no more than simple work-related decisions, could "deal with changes in a routine work setting only and had a substantial loss in ability to respond appropriately to supervision." R. 153. Next, the ALJ found that no jobs existed in significant numbers that the Claimant could have performed during the closed period. R. 158. But critically the ALJ found that if the Claimant had stopped abusing substances, there were a significant number of jobs in the national economy that he could have performed during the closed period. R. 163. Moreover, the ALJ found that the Claimant's "substance use disorder [was] a contributing factor material to the determination of disability." R. 164. Therefore, the ALJ found that the Claimant was not disabled. R. 164.

On February 8, 2011, the Appeals Council denied the Claimant's request for review. R. 1. The denial resulted in a final administrative decision by the Commissioner. Dkt. #10, p. 3.

## II. LEGAL STANDARDS

A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the

district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v.*

*Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Sarchet v. Carter*, 78 F.3d 305, 307 (7th Cir. 1996).[3] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary

---

[3] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief."). An exception to the *Chenery* doctrine is the harmless-error doctrine, which allows a court to affirm if the outcome on remand is foreordained. *See Osmani v. INS,* 14 F.3d 13, 15 (7th Cir. 1994) (harmless error does not require remand "when it is clear what the agency's decision has to be"); *Sahara Coal Co. v. Office of Workers' Compensation Programs*, 946 F.2d 554, 558 (7th Cir. 1991); *see also Parker*, 597 F.3d at 924.

B. Disability Standard

Disability insurance benefits are available to a claimant who can establish that he is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d 736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

21

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v).  Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740.  After the claimant has proved that he cannot perform his past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist in the national economy that the claimant can perform.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

But when a claimant's alleged disability may have been caused by substance abuse, the ALJ must continue the analysis in the fifth step.  The ALJ must determine whether the claimant would still be disabled if the claimant were not a substance abuser. 42 U.S.C. §423(d)(2)(C); 20 C.F.R. §404.1535(b)(1); *see Denham v. Astrue*, 2010 U.S. Dist. LEXIS 9862, *19, n.7 (N.D. Ind. 2010).

# III. DISCUSSION

A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded for two (2) reasons. First, the Claimant contends that the ALJ erred in finding that the Claimant possessed no exertional limitations because Dr. Salzmann stated that the Claimant could not lift and carry fifty (50) pounds for up to one-third (1/3) of an eight-hour work day due to the Claimant's "uncontrolled" Type II diabetes, hypertension and ability to concentrate. According to a September 14, 2009 note, Dr. Salzmann asserted that the "medical contraindication would be risk of heart attack or stroke." In short, the Claimant asserts that the ALJ erred in finding that the Claimant's hypertension and diabetes were not "severe" impairments. The Claimant asserts that if he cannot perform medium work, then, as an operation of law, he would be entitled to benefits. R. 16 – 17; Dkt. #23, p. 10 – 11. Second, the Claimant contends that the ALJ erred in finding that his alcohol abuse was a contributing factor material to his mental disability. The Claimant addresses both these issues under the theory that the ALJ improperly rejected the opinions of his treating physicians.

The Commissioner contends that the ALJ decision should be affirmed because the ALJ correctly found that the Claimant's diabetes and hypertension were not severe and only imposed minimal, if any, limitations on the Claimant's ability to function. Moreover, the Commissioner contends that the ALJ correctly

found that the Claimant's alcohol abuse was a contributing factor material to his disability.

B. Analysis

1. The ALJ Did Not Err in Finding that the Claimant's Hypertension and Diabetes Were Not Severe.

Pursuant to SSA regulations, to receive benefits, a claimant must have a severe impairment. 20 C.F.R. §404.1520(c). For an impairment to be "severe," the impairment must *significantly limit* the claimant's physical or mental ability to do *basic work activities*. 20 C.F.R. §404.1520(c) (emphasis added). Another regulation states the same principle but in the negative: "An impairment . . . is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1521(a). The regulations define "basic work activities" to "mean the abilities and aptitudes necessary to do most jobs," and then provides the following examples (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §404.1521(b)(1 – 6).

There is no doubt that the ALJ found that the Claimant was suffering from severe impairments; namely, (1) affective disorder and (2) a history of alcohol abuse that was currently in remission. R. 150. And consequently, the ALJ continued on with the five-step analysis. R. 150 – 58. Instead, the issue the Claimant raises on

appeal is whether the ALJ properly found that the Claimant's hypertension and
diabetes were not "severe" at the second step of the analysis.

In finding that the Claimant's hypertension and diabetes were not severe, the
ALJ focused on the following substantial evidence. First, the ALJ noted that the
Claimant testified that the tingling the Claimant allegedly felt in his feet and
fingers did not impede his ability to engage in physical activities. R. 150.[4]  The
ALJ's finding in this regard is corroborated by the record. R. 93, 94. Indeed, the
Claimant testified that despite his symptoms he was "able to do what [he] needed to
do." R. 94. The ALJ found that the Claimant's blood sugar levels were "under
relatively good control" and "his blood pressure is also under better control." R. 150.
Again, the ALJ's finding with regard to the Claimant's blood sugar levels is
supported by the record. R. 40.  The ALJ also cited the Claimant's medical records
that showed that during the closed period the Claimant was doing very well, active
and eating well, and his blood sugar levels were very good and his blood pressure
was 110/80. R. 151.  The record supports the ALJ's citation to these facts. R. 49,
382, 488 - 90.  In fact, the Claimant admitted that he had "been doing really well."
R. 40.  Finally, the ALJ relied upon the Claimant's testimony regarding his
"extensive daily activities including significant home repairs requiring a great deal
of physical labor." R. 151.  Again, the record adequately supports the ALJ's findings
in this regard.  Indeed, the Claimant testified that he repainted his entire two-story
house over the course of a "couple of months," which required him to use a ladder,

---

[4] Interestingly, a medical record dated October 4, 2007, indicates that the Claimant did *not*
have tingling sensations, thereby corroborating the ALJ's finding. R. 468.

prepare the house's surface to be painted, and move the ladder and paint cans; and the Claimant re-sealed his driveway, which took about five hours, during which time he carried 4.75 gallon containers. R. 36, 37, 38, 52.[5]   The Claimant's admissions regarding his activities were corroborated by the medical records, which indicated that the Claimant did home repairs, cooked, cleaned, shopped and participated in sports. R. 386, 389.

Indeed, an analysis of the regulation's examples of basic work activities shows that ALJ's decision was correct.  For example, there was no evidence that the Claimant's ability to walk, stand, sit, push, pull, reach, carry, handle, see, hear, speak; understand, carry out and remember simple instruction; use judgment and deal with changes in a work setting were limited, let alone significantly limited, because of the hypertension and diabetes.  And it is important to remember that it is the Claimant's burden to show his impairment is severe. *See Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (identifying burdens at various stages).

The Claimant's argument assumes that under the particular circumstances of this case the "basic work activities" would need to be those activities that a person who was capable of performing medium work could accomplish.  The Claimant's assumption is incorrect.  The SSA regulations regarding severity do not require that the impairment meet a specific level of work; i.e., light, medium or

---

[5]  It is common knowledge that a gallon of water weighs approximately eight (8) pounds. Consequently, assuming 4.75 gallons driveway sealant is equivalent to the same weight as 4.75 gallons of water, the Claimant was lifting about 38 pounds.  According to Home Depot, however, the containers of sealant probably weighed about 50 pounds each because driveway sealant is heavier. http://www.homedepot.com/p/Latex-ite-4-75-Gal-Airport-Grade-Driveway-Sealer-73066/100479155.

heavy.  Indeed, the regulations define basic work activities to "mean the abilities and aptitudes necessary *to do most jobs*." 20 C.F.R. §404.1521(b) (emphasis added). The Claimant's argument would read the words "to do most jobs" out of the regulation.  Courts cannot interpret regulations in that manner. *Gillespie v. Trans Union*, 433 F. Supp. 2d 908, 914 (N.D. Ill. 2006); *see also U.S. v. Dooley*, 578 F.3d 582, 588 (7th Cir. 2009) (in interpreting a statute, courts cannot read words out); *U.S. v. A&P Trucking Corp.*, 113 F. Supp. 549, 551 (D.N.J. 1953) (regulations construed under same canons as statutes).  Moreover, the Claimant cites no authority to support his assumption.  Because the Claimant failed to develop the argument as to why the basic work activities would be those activities that a person who was capable of performing medium work could accomplish, the Claimant has forfeited this argument. *Bratton v. Roadway Package System*, 77 F.3d 168, 173 n. 1 (7th Cir. 1996).

The Claimant's sole "evidentiary" argument relies upon a last-minute opinion provided by Dr. Salzman, who was the Claimant's treating physician.  Following the close of the second hearing, the Claimant's counsel submitted a document signed by Dr. Salzman.  The Claimant's counsel presented this document to Dr. Salzman and asked the following question: "With regard to the above-named patient, during the indicated period of time, to a reasonable degree of medical certainty, would there have been any medial contraindications to him lifting and carrying 50 pounds for up to 1/3 of an 8-hour work day? If yes, please set forth what the medical contraindications would have been." The submitted document then possesses two

hand-written notations. The first notation is dated on September 8, 2009, and signed by Dr. Salzman, and states, "yes because of *uncontrolled* Type II Diabetes, hypertension and inability to concentrate." R. 503 (Emphasis added). Apparently because the answer was not complete and not responsive with respect to the contraindications, on September 14, 2009, Dr. Salzman wrote a subsequent note on the same document, stating "medical contraindication would be risk of heart attack or stroke." R. 503.

Although the ALJ considered Dr. Salzman's opinion, she ultimately rejected it. The ALJ properly found that "the evidence does not show either the diabetes or hypertension to be uncontrolled; symptomatic or to cause any limitation on concentration." R. 151.

A treating physician's opinion about the nature and severity of the claimant's impairment is given controlling weight *if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with substantial evidence in the record.* 20 C.F.R. §404.1527(d)(2) (emphasis added); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004). An ALJ may discount a treating physician's opinion if it is inconsistent with a consulting physician's opinion or is internally inconsistent. *Skarbek,* 390 F.3d at 503. Indeed, courts can discredit sudden and unexplained changes in a treating physician's opinion. *See Schmidt v. Astrue,* 496 F.3d 833, 842-43 (7th Cir. 2007). When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision. *Dixon v. Massanari,*

270 F.3d 1171, 1178 (7th Cir. 2001). The Seventh Circuit "has repeatedly stressed that 'a claimant's treating physician may be biased in favor of the claimant; bias that a consulting physician may not share.'" *Butera v. Apfel*, 173 F.3d 1049, 1056 (7th Cir. 1999) quoting *Micus v. Bowen*, 979 F.2d 602, 607 (7th Cir. 1992).

The evidence is undisputed – and admitted by the Claimant – that Dr. Salzman never placed any restrictions on the Claimant's physical activities. R. 52, 415. The first and only time Dr. Salzman ever mentioned any physical restrictions occurred after the second hearing and when presented with the document from the Claimant's attorney. And despite the Claimant's counsel's efforts, Dr. Salzman was required to make two stabs at providing the sought-after opinion. The opinion is not supported by substantial evidence in the record and is inconsistent with the Claimant's admissions and substantial contrary evidence, including Dr. Salzman's own decision not to place any physical restrictions on the Claimant. Moreover, despite the Claimant's counsel's representation to the ALJ that additional treatment notes would be provided, none were, which is a telling omission. Just as telling by omission is the complete failure to provide any medical records to support the change in Dr. Salzman's opinion. Moreover, Dr. Salzman's "opinion" refers to the Claimant's diabetes and hypertension as "uncontrolled," but the Claimant and his attorney admitted that the diabetes and hypertension were being controlled. R. 17, 48. These admissions were corroborated by the medical records. R. 492. On appeal, the Claimant argues that Dr. Salzman's opinion was a more specific response to a specific question. That argument is meritless. Dr. Salzman placed no

physical restrictions on the Claimant and stated so. That statement subsumes the last-ditch effort to present a contrary opinion that is inconsistent with the medical records, the Claimant's testimony and admissions and even counsel's representations before the ALJ.

Although not specifically cited by the ALJ, additional record evidence, including multiple admissions by the Claimant support the ALJ's decision that the Claimant's hypertension and diabetes are not severe; meaning that these impairments do not significantly limit his ability to do basic work activities. For example, throughout the April 1, 2008 hearing, the Claimant repeatedly stated that his hypertension and diabetes were under control and that these impairments did not prevent or hinder him from working. R. 86, 87, 93, 94. Indeed, during the August 6, 2009 hearing, even his attorney admitted that the Claimant's blood pressure and diabetes were "under better control." R. 17, 48. During that same hearing, the Claimant identified the medications he was taking to *control* his diabetes. R. 29. At the April 1, 2008 hearing, when asked why he was unable to work, the Claimant never mentioned his hypertension or diabetes or the symptoms from those impairments. R. 108. At the August 9, 2009 hearing, when his attorney asked him if he could have worked during the closed period, the Claimant was again silent as how his diabetes and hypertension would have prevented him from working. R. 48. The Claimant also drove a car, cut grass, baby sat his grandchild with his wife, fixed cars, gardened, and took his elderly father on errands. R. 84, 99, 101, 106, 107. The record shows that the Claimant even engaged in sports. R.

389.  Additionally, the Claimant began working on January 28, 2009.  R. 17.  And at that job, he helped remodel a Walmart, by among other things, reconfiguring shelves. R. 30 – 31.  Following the remodel, the Claimant began working at the deli section. R. 30.  Moreover, the Claimant testified that he would occasionally lift a thirty (30) pound box of chicken at his new job. R. 32.  Although the Court is mindful that it cannot re-write the ALJ's decision, the Court also recognizes that the harmless-error doctrine does not require it to remand this case only so that the ALJ can reach the same result.  Moreover, the ALJ's failure to cite to this specific evidence does not mean that the Court cannot consider it as further support. *See Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006) ("Even though the ALJ does not cite specifically to this objective evidence, the evidence is included in the record, and the ALJ makes a general reference to it.").

Substantial evidence supports the ALJ's finding that the Claimant's diabetes and hypertension were not severe.  The ALJ did not err in this regard.

2. Claimant's Alcohol Abuse Was A Contributing Factor to His Mental Disability.

As noted previously, when an applicant for disability benefits has a potentially disabling illness and is a substance abuser, the issue for the ALJ is whether, were the applicant not a substance abuser, he would still be disabled. *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006).  The regulations state that the key factor is whether the Commissioner would still find the applicant disabled if he were to stop using drugs or alcohol. 20 C.F.R. §404.1535(b); *see Briggs v. Colvin*, 2013 U.S. Dist. LEXIS 154776, *13 (N.D. Ill. 2013).

Before conducting this analysis, the Court must first address which party bears the burden on this issue. The Commissioner argues that the Claimant has the burden of establishing that he is disabled under the SSA. Dkt. #30, p. 8. There is considerable debate as to which party bears the burden of showing that a claimant would be disabled absent drug or alcohol abuse. *See Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1093-96 (N.D. Ill. 2012) (noting court split). But the Claimant never argued that the Commissioner bore the burden on this issue and did not dispute the Commissioner's assertion that the Claimant bore the burden. Accordingly, the Claimant has waived this issue. *Wojtas v. Capital Guard Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (failure to respond to contention results in waiver). Because of the Claimant's waiver, the Court need not wade into the murk in this case. *Mikolasjczyk v. Colvin*, 2013 U.S. Dist. LEXIS 140423, *32-33 (N.D. Ill. 2013). The Court's analysis presumes that the Claimant carries the burden. This presumption that is supported by case law, including an unpublished Seventh Circuit decision. *Id.* citing *Harlan v. Astrue*, 424 F. App'x 564, 567 (7th Cir. 2011).

The ALJ engaged in a thorough and detailed analysis of the Claimant's alcohol abuse and mental illness. R. 151-64. In the process, the ALJ addressed the varying opinions and the bases for those opinions. During her analysis, the ALJ noted Dr. Sherman's opinion that the Claimant's mood disorder was due to his alcohol abuse. R. 156. The ALJ also noted that Dr. Schiff was the only medical source who reviewed and considered all the evidence in the record, including the Claimant's testimony at both hearings. R. 157. The ALJ discounted Dr. Garlapati's

opinion that the Claimant's alcohol abuse did not contribute to the Claimant's limitations because Dr. Garlapati only saw the Claimant while he was abusing alcohol. R. 157. The ALJ's factual basis in the regard is correct. The Claimant argues that Dr. Garlapati saw him while his alcohol consumption had decreased 50%. Dkt. #23, p. 4. But the Claimant fails to recognize that he was still drinking three to four times per week at that time. R. 367-68. Importantly, the ALJ also noted that since the Claimant stopped using alcohol, he has returned to work and has been able to maintain that work. R. 160. The ALJ concluded that the greatest improvement and change in the Claimant's behavior occurred when he stopped drinking and was able to return to work. R. 161. And the ALJ's conclusion was supported by Dr. Schiff's opinion and the evidence upon which his opinion is based. R. 161 – 64.

The Claimant solely relies on *Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006) as his legal authority by selectively quoting one passage from that decision. But that case addressed a different issue and, importantly, was factually different. First, in *Kangail*, the Seventh Circuit cautioned the Commissioner from determining that applicants suffering from mental illness are not disabled by selectively relying on medical records showing that the applicant has "good days." Second, in *Kangail*, the Seventh Circuit noted that medical literature suggested that people suffering from mental illness – such as bipolar disorder – can abuse drugs and alcohol to alleviate the symptoms of mental illness. *Kangail*, 454 F.3d at

629.  Third, in *Kangail*, the ALJ "played doctor" by rejecting medical testimony without giving adequate reasons for doing so.  *Id.*

The Claimant's case is easily distinguishable.  First, the ALJ did not cherry pick a few medical records to avoid the episodic nature of bipolar disorder.  *See Triplett v. Colvin*, 2013 U.S. Dist. LEXIS 166974, *24 (N.D. Ill. 2013) ("But the ALJ did not merely mine the record for a few isolated gems of good cheer.").  Instead, the ALJ relied upon the record and the testimony of Dr. Schiff to establish the Claimant's improvement – beginning in June 2007 and running through April 2008 – once he stopped drinking alcohol.  R. 161, 163, 447, 448, 452, 453, 469-72.  Months of progress notes indicated the Claimant's improvement after he stopped abusing alcohol, which was a key fact upon which Dr. Schiff relied.  *See Diaz v. Astrue*, 685 F. Supp. 2d 825, 835 (N.D. Ill. 2010) ("Unlike *Kangail*, the Claimant's records here reflect improved functionality during periods when he was not abusing drugs or alcohol.").  Indeed, this case is much more similar to *Clifton v. Astrue*, 2012 U.S. Dist. LEXIS 84105, *41 n.3 (N.D. Ill. 2012) ("Unlike *Kangail*, this is not a case of 'good days and bad days' because Dr. Blount's treatment notes *consistently* report her mood as 'good' or 'ok'.") (emphasis in original).  Second, the Claimant presented no testimony at either hearing that he was abusing alcohol to alleviate the symptoms of his mental health condition, nor does the record contain any notation in any progress note establishing that phenomenon.  *See Hovi v. Colvin*, 2013 U.S. Dist. LEXIS 108595, *38 n.7 (W.D. Wisc. 2013) (distinguishing *Kangail* because the plaintiff cited "no evidence that she abused alcohol as a means of dealing with the

symptoms of mental illness"). Third, the ALJ did not reject medical testimony without giving adequate reasons. As noted above, the ALJ provided a lengthy analysis and numerous reasons for choosing to credit Dr. Schiff's opinion over Dr. Garlapati. The ALJ did not err in doing so, especially after noting that Dr. Schiff had the opportunity to review and evaluate the entire record, whereas Dr. Garlapati did not. R. 157. *Briggs v. Colvin*, 2013 U.S. Dist. LEXIS 154776, *25 – 26 (N.D. Ill. 2013) (relying upon medical expert opinion over treating physician opinion may be acceptable when medical expert had access to and reviewed entire medical record).

Moreover, the Claimant's argument that his improvement was caused by adjustments and changes in his medications is unsupported by any medical opinion. Dkt. #23, p. 12; Dkt. #31, p. 5. In both the opening brief and reply brief, the Claimant failed to cite any medical opinion to support this argument. Even after the Commissioner emphasized the glaring absence in her response brief, Dkt. #30, p. 13, the Claimant's reply brief still failed to cite to any medical opinion to support this argument. The Court's independent review of the record found no medical opinion to support the Claimant's argument, which likely explains the obvious omission. By making this argument without a supporting medical opinion, it was the Claimant who was "playing doctor." The Claimant even went so far as to argue that "The medical evidence does not support Dr. Schiff's position that Plaintiff's mental impairments resulted from alcohol use, not an underlying psychiatric issue." Dkt.#31, p. 5. This argument completely ignores Dr. Sherman's opinion – upon which Dr. Schiff specifically relied – that the Claimant's mood disorder was caused

by alcohol abuse. R. 388. Just as an ALJ cannot turn a blind eye to contrary evidence, claimants on appeal may not likewise totally ignore evidence that conflicts with their contentions.

Essentially, the Claimant's overarching argument is that his opinion witness should be credited over the opinion witnesses the ALJ chose to credit. This Court is not authorized to engage in that type of reweighing of the evidence. *Briggs*, 2013 U.S. Dist. LEXIS 154776 at *25 – 26. Dr. Schiff relied upon Dr. Sherman's extensive analysis in which she explicitly found that the Claimant suffered from "Mood disorder due to alcohol abuse." R. 388. That type of compelling evidence is absent from *Kangail*. The ALJ's decision was not erroneous by relying upon Dr. Schiff's opinion and the evidence supporting his opinion, particularly when the Claimant bore the burden of showing that absent his alcohol abuse he was disabled.

## IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.


It is so ordered.


Entered: 1/2/2014

**Iain D. Johnston**
**U.S. Magistrate Judge**